# In the United States Court of Federal Claims

No. 22-780C

(Filed Under Seal:  November 28, 2022)

(Reissued for Publication:  December 6, 2022)

|  |  |
|---|---|
| AHTNA LOGISTICS, LLC, | ) |
| *Plaintiff,* | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| *Defendant,* | ) |
| and | ) |
| AKIMA INFRASTRUCTURE PROTECTION, LLC, | ) |
| *Defendant-Intervenor.* | ) |

*Robert K. Tompkins*, Holland & Knight, LLP, Washington, D.C., for Plaintiff.  Of counsel were *Gordon N. Griffin*, *Hillary J. Freund*, *Kelsey M. Hayes*, and *Sean R. Belanger*.

*Delisa M. Sanchez*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  With her on the briefs were *Brian M. Boynton*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Elizabeth M. Hosford*, Assistant Director.  Of counsel was *Javier A. Farfan*, Office of the Principal Legal Advisor, United States Immigration and Customs Enforcement, Washington, D.C.

*C. Peter Dungan*, Miles & Stockbridge P.C., Washington, D.C, for Defendant-Intervenor. With him on the briefs were *Alfred M. Wurglitz*, *Tara D. Hopkins*, and *Rebecca S. Falk*.

<u>**OPINION AND ORDER**</u>*

*SOLOMSON*, **Judge.**

This case illustrates that no matter how many variations of pasta are thrown at a wall, sometimes none of it sticks.[1]  In this procurement dispute, Plaintiff, Ahtna Logistics, LLC ("Ahtna"), filed a 60-page complaint, containing 217 paragraphs, including eight counts of alleged error committed by Defendant, the United States, acting by and through Immigration and Customs Enforcement ("ICE"), a federal law enforcement agency within the Department of Homeland Security.  In particular, Ahtna challenges ICE's award of an approximately $200 million contract to Ahtna's competitor, Akima Infrastructure Protection, LLC ("AIP"), the Defendant-Intervenor.  Pending before the Court are the parties' respective motions for judgment on the administrative record ("MJARs") pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC").

After reviewing the robust administrative record and parsing Ahtna's claims, however, the Court finds some of Ahtna's claims redundant and all of them unsupported.  That is not to say that Ahtna's arguments fail to raise a challenging question here and there, but such questions do not substitute for the evidence necessary to succeed on the merits.  Moreover, Ahtna fails, in any event, to demonstrate prejudice on the merits — an issue, in this Court's experience, to which plaintiffs all-too-often do not pay sufficient attention, usually at their own peril.

In sum, the Court sides with the government and AIP and concludes that the government's conduct of this procurement was quite well-documented, reasonable, and not contrary to law.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.  The Procurement

On August 11, 2021, ICE issued a request for proposals, Solicitation No. 70CDCR21R00000007 (the "Solicitation" or "RFP"), seeking "detention, food, and

---

* Pursuant to the protective order in this case, the Court initially filed this opinion under seal on November 28, 2022, and directed the parties to propose redactions of confidential or proprietary information by December 5, 2022.  ECF No. 53.  The parties have jointly submitted proposed redactions to the Court.  ECF No. 55.  The Court adopts those redactions, as reflected in this public version of the opinion.  Words or phrases that are redacted have been replaced with [ * * * ].

[1] *See TNS Media Rsch. LLC v. TiVo Rsch. & Analytics, Inc.*, 2018 WL 2277836, at *6 (S.D.N.Y. May 18, 2018) ("It is not completely unheard of for counsel in a complex litigation matter to employ a 'spaghetti on the wall' approach (just hoping that something will stick)[.]").

[2] This background section constitutes the Court's findings of fact drawn from the administrative record.  Rule 52.1 of the Rules of the United States Court of Federal Claims, covering judgment

transportation services" at Port Isabel Detention Center ("PIDC") in Los Fresnos, Texas. AR 237–38, 247–414.  The Solicitation informed potential offerors that ICE intended to award a "hybrid" indefinite-delivery, indefinite-quantity contract, on a firm-fixed price basis, with a performance period covering a one-year base period and four one-year option periods, in accordance with Federal Acquisition Regulation ("FAR") 17.2. AR 2318 (RFP § F.2); AR 2377 (RFP § L.2).  ICE issued various amendments, with the first on August 11, 2021, and the last on November 9, 2021.  AR 1527, 2517.  The RFP, as amended on November 3, 2021, instructed offerors to submit proposals in three volumes. AR 2299, 2378 (RFP § L.4.1).  The first volume had to describe an offeror's proposed "Technical Approach," including staffing.  AR 2378, 2381–82 (RFP §§ L.4.1, L.6.3).  The second volume had to address an offeror's "Past Performance" in specific projects via the submission of past contract references.  AR 2378, 2384–85 (RFP §§ L.4.1, L.6.4).  The third volume consisted of an offeror's "Price Proposal."  AR 2378, 2385–88 (RFP §§ L.4.1, L.6.5). The RFP required offerors to submit initial proposals by October 1, 2021.  AR 2233 (RFP Amend. 6, dated September 10, 2021).

Section L of the RFP detailed how offerors were to prepare and submit their three proposal volumes.  It generally advised offerors that, because proposals "constitute[] the major basis for [the agency's] formal judgment, it will be advantageous to the contractor to present a proposal in a clear, concise manner and in terms understandable to those who may be unfamiliar with the contractor's detailed intentions and reasoning process." AR 2380 (RFP § L.6).  Furthermore, the RFP provided that "[e]ach proposal shall:  (1) be specific and complete in every detail; (2) conform to all solicitation provisions, clauses, or other requirements; (3) be logically assembled, practical, legible, clear, concise, coherent, and indexed . . . ; and (4) contain appropriately numbered pages of each volume or part." AR 2380.  The RFP cautioned offerors to provide their "best terms from a Price and Technical standpoint."  AR 2392 (RFP § M.3).  Even so, "the Government reserve[d] the right to enter into discussions, establish a competitive range, and . . . request Final Proposal Revisions . . . for all volumes from offerors."  AR 2392 (RFP § M.3).

The technical volume had to address:  (1) the offeror's "[t]echnical [c]apability/ [m]anagement approach"; (2) the offeror's "[s]taffing [p]lan and [p]rocedures"; and (3) the offeror's "[t]ransition [p]lan."  AR 2381–84 (RFP § L.6.3).  Offerors had to demonstrate that they understood and would meet the RFP's requirements.  AR 2381–82 (RFP §§ L.6.3(1)–(2)).  The proposal had to describe and "clearly support and substantiate any innovative, creative and cost-effective methods" of performance.  AR 2381–82 (RFP § L.6.3(1)).  The RFP also required offerors to explain how they would structure and

---

on the administrative records, "is properly understood as intending to provide for an expedited trial on the record" and requires the Court to "make factual findings from the record evidence as if it were conducting a trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354, 1356 (Fed. Cir. 2005).  Citations to the corrected administrative record, *see* ECF No. 34, are denoted as "AR" followed by the page number.  Additional findings of fact are made throughout Part IV.

support their workforce to meet the PIDC's needs.   AR 2382–83 (RFP § L.6.3(2)). Although offerors had to "address the minimum post requirements of [the RFP's] Attachment 3," the RFP expressly permitted deviations, instructing that "[a]ny deviation(s) from the template . . . must demonstrate conformance with all [Performance Work Statement] and contract requirements and applicable standards[.]"   AR 2382–83 (RFP § L.6.3(2)).

For the past performance volume, the RFP required each offeror to provide three "recent and relevant contracts" as references to determine "how well contractors and subcontractors have satisfied customers, adhered to applicable . . . laws . . . , and conducted its business in an ethical manner."   AR 2384–85 (RFP § L.6.4).   Such references could include those involving predecessor companies (provided that offerors "explain the difference between [themselves] . . . and the predecessor compan[ies]") and affiliates (provided that offerors "demonstrate how the affiliate will be involved in performance and how the affiliate will share resources with the [o]fferor[s]").   AR 2384 (RFP § L.6.4).

In the pricing volume, offerors had to provide prices for contract line items ("CLINs") to "provide all management, supervision, labor, and materials necessary to perform the services identified in the Performance Work Statement (PWS) on an Indefinite Delivery — Indefinite Quantity (IDIQ) basis to have detention services purchased on a firm-fixed price basis."   AR 2301 (RFP § B.1).   Each CLIN had to be supported by a basis of estimate ("BOE").   AR 2385–87 (RFP § L.6.5).   The purpose of the BOEs is "to ensure the offerors understand the [CLINs'] requirement."   AR 2386.   The RFP did not identify mandatory minimum requirements for BOEs but cautioned that "[o]fferors that provide limited information may be determined to lack understanding of the requirement."   AR 2386 (emphasis omitted); *see also* AR 2398 (RFP § M.7).   Price proposals had to account for collective bargaining agreements ("CBAs") that the RFP included, but the RFP provided almost no limitations on how that should be accomplished.   AR 2387 (RFP § L.6.5) ("To ensure a fair procurement process, the Government instructs all offerors to base pricing for all [CBA] labor categories on the entry level position with no seniority or leave accrual.").

The RFP specified the following evaluation factors:   (1) technical capability/ management approach; (2) staffing plan and procedures; (3) transition plan; (4) past performance; and (5) price.   AR 2378, 2392 (RFP §§ L.4.1, M.5.1).   Based on these factors, the RFP required ICE "to award a contract to the contractor whose proposal . . . conform[ed] to the solicitation and represent[ed] the overall best value to ICE through a best value trade off approach."   AR 2391 (RFP § M.3).   To determine the offeror that proposed the best value, ICE designated a Source Selection Evaluation Board ("SSEB") to assess each proposal and "present its findings" to the Source Selection Authority ("SSA") for a final decision.   AR 2392 (RFP § M.3).

The first two factors — technical capability/management approach and staffing plan and procedures — were evaluated and assigned one of three "confidence intervals": (1) "High Confidence"; (2) "Some Confidence"; or (3) "Low Confidence." AR 2393 (RFP § M.5.1). That assessment depended upon "the offeror's demonstrated ability to meet the technical requirements." AR 2393 (RFP § M.5.1); *see* AR 2396 (RFP § M.7). The transition plan was rated similarly — as "High Confidence," "Some Confidence," or "Low Confidence" — based on the offeror's likelihood of a "seamless transition" and the "risk there will be a need for Government intervention." AR 2393 (RFP § M.5.1); *see* AR 2396 (RFP § M.7) (explaining that "[t]he Government will evaluate the offeror's Transition Plan for soundness, completeness, efficiency, and effectiveness including . . . [how it] address[es] issues typically encountered").

For the fourth factor — past performance — ICE evaluated an offeror's past performance references to determine "the Government's level of confidence in the offeror's ability to perform the solicitation requirements." AR 2394 (RFP § M.5.1). Each past performance reference was evaluated based on its assessed "recency, relevancy, scope, and complexity." AR 2394 (RFP § M.5.1); *see* AR 2397 (RFP § M.7) (providing that "[t]he past performance assessment is based on consideration of all relevant facts and circumstances"). The SSEB ultimately assigned past performance ratings at one of four "levels of confidence ratings": (1) "High Confidence"; (2) "Some Confidence"; (3) "Low Confidence"; or (4) "Neutral Confidence" — the last one for offerors that lack a recent, relevant, "or any performance record." AR 2394 (RFP § M.5.1); *see* AR 2397 (RFP § M.7).

The fifth factor — price — was "not . . . assigned a Confidence Level Rating," but the SSEB had to confirm "the reasonableness of the proposed prices" and that the price proposal was consistent with the technical proposal. AR 2394 (RFP § M.5.1); AR 2397 (RFP § M.7) (explaining that "[t]he Price proposal will be compared to the Technical Approach proposal for consistency" and that ICE would perform "an analysis for unbalanced pricing"). With regard to the CBAs, the RFP provided that "[a]ll submitted *prices* will be checked to ensure compliance with the applicable Wage Determination or CBAs." AR 2398–99 (RFP § M.7) (emphasis added). A failure to comply with a wage determination or account for CBAs was not grounds for automatic disqualification; rather, any such "[d]iscrepancies will be noted and provided to the SSA" and the contracting officer. AR 2399 (RFP § M.7).

Because this is a best value procurement, the SSA was permitted to "determine that a [proposal's] superior solution/approach, as determined through the evaluation factors, merits a higher price, and therefore represents the best value to the Government." AR 2395 (RFP § M.5.3). In that regard, "Factors 1–4 are listed in descending order of importance" and "[w]hen combined, . . . are significantly more important than Factor 5, Price." AR 2395 (RFP § M.6). As is typical in best value procurements, where proposals are "more equal based on [the non-price] factors," the overall price is more likely to

"become the ultimate determining factor for award of the contract."   AR 2395 (RFP § M.6).

### B.  Initial Proposals and Discussions

In response to the Solicitation, ICE received complete initial proposals from three offerors: Ahtna, AIP, and Paragon Professional Services, LLC ("Paragon").  AR 4920.[3]  On January 27, 2022, ICE established a competitive range and opened discussions with the three offerors.  AR 3162–63 (Competitive Range Determination) (citing FAR 15.306(c)); *see also* AR 3176 (revised competitive range notification to Ahtna); AR 3164 (competitive range notification to AIP); AR 3169 (competitive range notification to Paragon).

As part of ICE's competitive range determination, ICE concluded that all three offerors proposed reasonable prices.  AR 3162.  For the non-price factors, ICE reached the following initial assessments:

| Evaluation Factors | Offeror | | |
|---|---|---|---|
| | Ahtna | AIP | Paragon |
| Technical Capability/ Management Approach | High Confidence | Low Confidence | Some Confidence |
| Staffing Plan and Procedures | Some Confidence | Low Confidence | Some Confidence |
| Transition Plan | High Confidence | Low Confidence | Low Confidence |
| Past Performance | High Confidence | High Confidence | High Confidence |

AR 3162.  For all three proposals, ICE expressed optimism that discussions could improve proposals.  AR 3162.

On January 27, 2022, the agency provided Ahtna, AIP, and Paragon with proposal-specific discussion issues and areas for improvement.  AR 3164–75 (Competitive Range Notification and Discussion Letters).[4]  On February 2, 2022, ICE transmitted to the offerors revised versions of the discussion documents to reflect ICE's answers to offeror questions.  AR 3176–85 (Ahtna); AR 3392–98 (AIP); AR 3399–406 (Paragon).  Each letter

---

[3] The administrative record contains a fourth initial proposal, from Couric Enterprises, LLC, AR 2760, but it was incomplete.  AR 3085–86; AR 4972 (Source Selection Decision Document) (noting that Couric's proposal "did not submit a complete proposal package by the closing date and time of the solicitation").

[4] The Court was unable to locate ICE's original discussion letter to Ahtna in the administrative record, but the revised version of that letter, *see* AR 3176–85, is an edited version that appears to contain the original language.

instructed the offeror to "address the [noted] deficiencies, significant weaknesses, weaknesses, findings, and negotiation points for each price and non-price evaluation factor."  AR 3164, 3169, 3176, 3392, 3399.

On February 28, 2022, ICE sent offerors new discussion letters containing yet "additional questions and requests for information" and required offerors to submit their final proposals revisions ("FPRs") by March 3, 2022.  AR 3407–08 (Ahtna); AR 3410 (AIP); AR 3412–13 (Paragon).  On March 2, 2022, the FPR deadline was extended to March 4, 2022, and ICE provided offerors with final revised discussion letters that incorporated answers to offerors' further questions.  AR 3415–18 (Ahtna); AR 3420–21 (AIP); AR 3423–25 (Paragon).

On March 3-4, 2022, all three offerors submitted their FPRs.  AR 4154 (Ahtna); AR 4266 (AIP); AR 4496 (Paragon).

### C.  ICE's Evaluation of FPRs and Contract Award

Following the receipt of FPRs, ICE evaluated them pursuant to the RFP.  AR 4714–45 (Final Technical Evaluations); AR 4746–910 (Contractor Performance Assessment Reports); AR 4920–46 (Final Price Analysis Report); AR 4947–67 (Final Past Performance Evaluation).

On March 31, 2022, based on the FPR evaluations, the SSA finalized the Source Selection Decision Document ("SSDD"), memorializing ICE's selection of AIP as the contract awardee.  AR 4993–94.  The SSDD summarized ICE's final evaluation as follows:

| Evaluation Factors | Offeror | | |
|---|---|---|---|
| | Ahtna | AIP | Paragon |
| Technical Capability/ Management Approach | High Confidence | High Confidence | High Confidence |
| Staffing Plan and Procedures | High Confidence | High Confidence | High Confidence |
| Transition Plan | High Confidence | High Confidence | High Confidence |
| Past Performance | High Confidence | High Confidence | High Confidence |
| Total Proposed Price | [ * * * ] | [ * * * ] | [ * * * ] |
| Total Evaluated Price | $245,744,501.07 | $210,968,921.47 | $222,161,480.08 |

AR 4980.[5]

---

[5] "The summation of the total base amount and option periods, to include FAR 52.217-8, comprised the total evaluated price (TEP)."  AR 4975 (SSDD) ("To account for the option periods

The SSA found all offerors' proposed pricing "to be complete, balanced, and fair and reasonable" and compared the proposals' pricing for each CLIN.  AR 4986–90, 4992. Because "AIP allocated a much larger percentage of its cost to CLIN X001B [for variable bed day rates] than to CLIN X001A [for fixed monthly operations]," ICE also compared proposals' prices for the total of those CLINs.  AR 4987.  This culminated in a comparison of proposals' total evaluated prices that showed AIP had the lowest price (approximately $210.97 million), followed by Paragon (approximately $222.16 million), and then followed by Ahtna (approximately $245.74 million).  AR 4990–91.  Ultimately, the SSA identified two factors for which AIP's proposal would merit a higher price and only one such factor for Paragon.  AR 4981–83; *see* AR 4992 (concluding that "[o]verall, . . . AIP is offering the superior solution/approach and merits a higher price").  The SSA concluded that Ahtna did not offer any superior approaches in any evaluation factor that would merit a higher price.  AR 4981–85.

The record thus reflects that "AIP [was] offering the superior solution/approach and merit[ed] a higher price[, yet] . . . AIP [was] also offering the lowest price."  AR 4992, 4993.  Accordingly, the SSA concluded "that AIP offers the best value to Government." AR 4992.

On April 1, 2022, ICE awarded the contract to AIP.  AR 4995–96.  That same day, ICE notified Ahtna that its proposal was unsuccessful.  AR 6191–94.

### D.  GAO Protest

On April 11, 2022, Ahtna filed a post-award protest with the Government Accountability Office ("GAO"), challenging ICE's decision to award the contract to AIP. AR 6214.  Ahtna argued that ICE "engaged in numerous evaluation errors" when it compared offerors' proposals and that these errors "deeply prejudiced" Ahtna.  AR 6215.

In response to Ahtna's protest, ICE argued Ahtna was not an "interested party . . . whose direct economic interest would be affected by the award of a contract[.]"  AR 6474, 6481–82 (citing 4 C.F.R. §§ 21.1, 21.0(a)(1)).  The GAO instructed Ahtna to submit supplemental briefing on its interested party status, AR 6620, and ultimately decided that Ahtna "is not an interested party to challenge the award to AIP," AR 6655 (*Ahtna Logistics, LLC*, B-420677, 2022 CPD ¶ 169, 2022 WL 2664108, at *1 (Comp. Gen. June 30, 2022)).  GAO reached this conclusion because ICE "found both AIP and [Paragon's] proposals to be

---

possible under FAR 52.217-8, Options to Extend Services, the Government evaluated the option to extend services by adding six months of the offeror's final option period price to the offeror's total price."); *see also* AR 4993 (selecting "AIP [to] be awarded a contract in the amount of [ * * * ] as the best value to the Government" and noting that "[t]he contract amount does not include the FAR 52.217-8 period"); AR 2318 (RFP § F.2); AR 2179 (RFP Attach. 2).

superior to Ahtna's" and Ahtna's proposed price was above Paragon's.  AR 6657–61 (*Ahtna Logistics*, 2022 WL 2664108, at *2–5).  According to the GAO, "where there is an intervening offeror [such as Paragon] who would be in line for the award even if the protester's challenges were sustained," the intervening offeror necessarily "has a greater interest in the procurement than the protester, and we generally consider the protester's interest to be too remote to qualify it as an interested party."  AR 6658 (*Ahtna Logistics*, 2022 WL 2664108, at *2 (citing *SRA Int'l, Inc.; NTT Data Servs. Fed. Gov't, Inc.*, B-413220.4, 2017 CPD ¶ 173, 2017 WL 2461534 (Comp. Gen. May 19, 2017))).  The GAO thus dismissed Ahtna's protest without reaching its merits.  AR 6661 (*Ahtna Logistics*, 2022 WL 2664108, at *5–6).

### E. Ahtna's Complaint

On July 18, 2022, Ahtna filed suit in this Court pursuant to 28 U.S.C. § 1491(b), challenging ICE's award of the PIDC contract to AIP.  ECF No. 1 ("Compl.").  Ahtna's complaint contains a scattershot of eight (8) separate counts.

In **Count I**, Ahtna asserts that ICE failed to check AIP's and Paragon's pricing for completeness or for consistency with either of their proposed technical approaches or the RFP's requirements.  Compl. ¶¶ 95–106.  Ahtna also argues that ICE overlooked "gross mathematical errors" in AIP's calculations that substantially understated each labor category's cost and would "understaff[] and under compensat[e] employees" to the tune of $55 million over the life of the contract.  *Id.* ¶¶ 107–11 & n.6, 114–22 (emphasis omitted).

In **Count II**, Ahtna essentially asserts that AIP's and Paragon's staffing plans and procedures did not meet the RFP's minimum post requirements.  Compl. ¶¶ 124–32.

In **Count III**, Ahtna claims that ICE's evaluation of AIP's and Paragon's respective technical and management approaches did not comply with the RFP because ICE gave those proposals High Confidence ratings.  Compl. ¶¶ 137–145.  Ahtna alleges that these ratings were undeserved because of AIP's understaffing and inconsistencies, *id.* ¶¶ 137–44, and because "[Paragon's] proposal, and its extremely low price, reveal its [approach] . . . was equally flawed," *id.* ¶ 145.

In **Count IV**, Ahtna asserts that ICE had "no reasonable basis" to conclude AIP's and Paragon's transition plans could "accomplish as seamless of a transition and ensure no disruption to ongoing operations as well as Ahtna."  Compl. ¶¶ 148–50.

In **Count V**, Ahtna challenges ICE's High Confidence rating of AIP's past performance.  Compl. ¶¶ 158–61.  Ahtna disputes that rating because AIP relied on its affiliate's past performance despite the RFP's having provided that past projects by the offering entity were "most relevant."  *Id.* ¶¶ 165–66 (emphasis omitted).  In that regard, Ahtna asserts that AIP's proposal failed to demonstrate that AIP would use its affiliate's

resources in the performance of the PIDC contract.  *Id.* ¶¶ 162–63.  Ahtna thus concludes that AIP merited only a "Neutral" rating for past performance.  *Id.* ¶ 164–65.

In **Count VI**, Ahtna maintains that ICE's discussions were misleading because they critiqued Ahtna's initial proposal in ways that unfairly caused Ahtna to increase its price in its FPR.  Compl. ¶¶ 168–77.  Additionally, Ahtna claims ICE's discussions with Ahtna and AIP were unequal because in two areas ICE criticized elements of Ahtna's proposal while ignoring or praising comparable elements of AIP's proposal.  *Id.* ¶¶ 178–85.

Finally, **Count VII** and **Count VIII** are merely derivative of the first six counts. Ahtna claims that ICE treated Ahtna and AIP "unequally" across all five evaluation factors, Compl. ¶¶ 188–211, and that the evaluation was so flawed as to render the best value tradeoff arbitrary and capricious, *id.* ¶¶ 212–217.

On July 19, 2022, the Court granted AIP's motion to intervene in this case.  ECF No. 8; July 19, 2022, Minute Order.  On August 1, 2022, ICE voluntarily stayed the award of the contract to AIP until 1:00 p.m. on November 14, 2022.  ECF No. 27 at 1–2.  On August 30, 2022, the parties filed timely MJARs pursuant to RCFC 52.1; the government filed a corrected MJAR a week later.  ECF No. 37 ("Pl. MJAR"); ECF No. 42 ("Def. MJAR"); ECF No. 36 ("Def.-Int. MJAR").  The parties filed timely response briefs on September 30, 2022.  ECF No. 46 ("Pl. Resp."); ECF No. 47 ("Def. Resp."); ECF No. 45 ("Def.-Int. Resp.").

On October 19, 2022, the Court held oral argument on the parties' cross-MJARs. ECF No. 50 ("Tr.").

## II.   JURISDICTION

The Tucker Act provides that an "interested party" may file an "action" in this Court "objecting [1] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [2] to a proposed award or [3] the award of a contract or [4] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1); *see also Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 559 & n.18 (2021) ("Section 1491(b) actions are typically referred to as 'bid protests.'").[6]

---

[6] *Cf. Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 96–97 (2020) ("[A]lthough '[the Administrative Dispute Resolution Act] covers *primarily* pre- and post-award bid protests,' the Federal Circuit in *RAMCOR* explicitly reversed this Court's determination 'that a [plaintiff] could only invoke § 1491(b)(1) jurisdiction by including in its action an attack on the merits of the underlying contract award' or the solicitation." (third alteration in original) (quoting *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999))).

"Standing is an integral part of jurisdiction." *Seventh Dimension, LLC v. United States*, 160 Fed. Cl. 1, 14 (2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "The party invoking federal jurisdiction bears the burden of establishing standing." *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (citing *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002)). "Where a plaintiff lacks standing, its case must be dismissed pursuant to RCFC 12(b)(1)." *Aero Spray, Inc.*, 156 Fed. Cl. at 556 (citing *Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003)).

To establish standing in a § 1491(b) action, a plaintiff must demonstrate that it is an "interested party." *Aero Spray, Inc.*, 156 Fed. Cl. at 559 ("[T]he Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, . . . defines not only this Court's jurisdiction over *what* actions may be brought against the government, but also *who* has standing to pursue them."). In a post-award protest action, an "interested party" is "[1] an actual or prospective bidder or offeror [2] whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting 31 U.S.C. § 3551(2)).[7]

Irrespective of the applicable "interested party" test, "the question of prejudice goes directly to the question of standing," and thus "the prejudice issue must be reached before addressing the merits." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *see also Myers,* 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). In that regard, "a plaintiff must allege *facts* — not mere conclusory assertions of law — demonstrating prejudice." *Vanquish Worldwide, LLC v. United States*, -- Fed. Cl. --, 2022 WL 17087798, at *10 (Fed. Cl. Nov. 10, 2022) (citing *Blue Origin Fed'n, LLC v. United States*, 157 Fed. Cl. 74, 89 (2021)); *see also Blue Origin Fed'n, LLC*, 157 Fed. Cl. at 89 ("[T]he court must decide whether those alleged facts show the protestor was prejudiced by the alleged errors." (citing *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996))).

"The Court assumes the *facts* alleged in a plaintiff's complaint are true for the purposes of evaluating standing but not for the purpose of resolving whether a plaintiff

---

[7] A different test applies in a pre-award action. In a pre-award protest action — typically involving a challenge to the terms of a solicitation — a plaintiff must allege facts that "demonstrate[] a 'non-trivial competitive injury which can be addressed by judicial relief.'" *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1362 (Fed. Cir. 2009) (quoting *WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998)); *see also Aero Spray, Inc.*, 156 Fed. Cl. at 562 (explaining that "[t]he Federal Circuit . . . modified that post-award standing test for pre-award cases" because "applying the [post-award] 'substantial chance' test makes little or even no sense" where "an agency is in the early stages of the procurement process and potential offerors have not even submitted proposals yet").

has demonstrated prejudice on the merits." *Vanquish Worldwide, LLC*, 2022 WL 17087798, at *10 (citing *Blue Origin Fed'n, LLC*, 157 Fed. Cl. at 89); *see also VAS Realty, LLC v. United States*, 26 F.4th 945, 950 (Fed. Cir. 2022) (explaining that, for the purposes of standing, "a court is required to accept as true all factual allegations pleaded" (quoting *Frankel v. United States*, 842 F.3d 1246, 1249 (Fed. Cir. 2016))); *Blue Origin Fed'n, LLC*, 157 Fed. Cl. at 89 ("For the limited purpose of determining whether it has standing, a protestor's allegations are assumed to be true." (citing *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 226 (Fed. Cir. 2019))); *Am. Relocation Connections*, 789 F. App'x at 226 ("For standing, we presume the party bringing a bid protest will succeed on the merits of its claim and ask whether it has alleged an injury (or prejudice) caused by the procuring agency's actions."); *Yang Enters., Inc. v. United States*, 156 Fed. Cl. 435, 444 (2021) ("The Court assumes well-pled allegations of error to be true for purposes of the standing inquiry.").

To succeed on the merits, however, including prejudice, a plaintiff must prove its allegations. *See Ascendant Servs., LLC v. United States*, 160 Fed. Cl. 275, 287–88 (2022) ("In order to be successful in a bid protest, a protestor must establish prejudice twice. First, it must establish prejudice as part of the standing inquiry. . . . Second, a protestor must also establish prejudice as part of its case on the merits. . . . On the merits of a bid protest, it is not enough to show that an agency has stepped out of bounds; rather, a protestor must further show that the offending agency's conduct prejudiced it."); *L-3 Commc'ns Corp. v. United States*, 99 Fed. Cl. 283, 289 (2011) ("[T]he prejudice determination for purposes of standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true.").

AIP, but not the government,[8] challenges Ahtna's standing on the grounds that it lacks "interested party" status. Def.-Int. MJAR at 6 ("As part of this Court's bid protest standing inquiry, a protestor must show that any alleged errors in a procurement were prejudicial."). And the Court, in any event, has an independent duty to ascertain whether it possesses jurisdiction to decide Ahtna's claims and whether it has standing to pursue them. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" (alteration in original) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984))); *see also* RCFC 12(h)(3).

Having reviewed Ahtna's complaint for factual allegations that, if proven, would support a finding of prejudice, the Court determines that Ahtna is an "interested party"

---

[8] *See* Tr. 178:14–21 (government confirming that it did not challenge Ahtna's interested party status but noting the government's "main concern with prejudice is the prejudice on the merits").

pursuant to 28 U.S.C. § 1491(b) with standing to maintain this action.[9]  In particular, Ahtna's complaint mounts a significant objection both to ICE's evaluation of the awardee's proposal (*i.e.*, AIP), as well as to Paragon's.  *See, e.g.*, Compl. ¶¶ 2, 10–14, 20–24, 100, 104–105, 114, 116, 123, 129, 132, 135, 145–46, 206.

AIP argues that Ahtna "cannot demonstrate prejudice because 1) Paragon's proposal was lower-priced, equally rated, and evaluated as superior to [Ahtna's] proposal and 2) because the Agency's evaluation of Paragon's proposal was rationally based."  Def.-Int. MJAR at 7; *see also id.* at 8 ("Even if each of the allegations raised against the Agency's evaluation of AIP's proposal were proven . . . , Ahtna has no direct economic interest because Paragon, not Ahtna, has the substantial chance of receiving [the] award, and Ahtna cannot establish interested party status under these facts.").  But AIP's argument merely begs the question whether Ahtna can, in fact, demonstrate that ICE's evaluations (of both AIP and Paragon) are arbitrary, capricious, or otherwise contrary to law.  That is a question that goes to prejudice *on the merits*, not standing.  AIP appears to recognize the distinction between standing and merits prejudice, noting that "Ahtna *must challenge* not only AIP's evaluation but also Paragon's evaluation *and show* that Ahtna was prejudiced by the specific allegations against Paragon."  *Id.* at 8 (emphasis added).  AIP, however, ignores or discounts Ahtna's numerous allegations in its complaint concerning Paragon on the grounds that "no argument contained within [Ahtna's complaint] holds water . . . [as] Ahtna's argument . . . is based on mere conjecture."  *Id.* at 9.  But whether a factual assertion "holds water" or "is based on mere conjecture" are *merits* inquiries.  For the purposes of standing, this Court assumes that a plaintiff's non-conclusory factual allegations are true.

Accordingly, the Court finds that Ahtna possesses standing to maintain its action because Ahtna's complaint contains sufficient factual allegations attacking ICE's evaluation of both AIP *and* Paragon.  Whether Ahtna has proven those allegations, including prejudice, via its MJAR briefing (and oral argument) is a *merits* question, which the Court addresses below.

## III.   STANDARD OF REVIEW

Judgment on the administrative record, pursuant to RCFC 52.1, "is properly understood as intending to provide for an expedited trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  The Rule requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record."  *Id.* at 1354.  Accordingly, this Court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence contained in the administrative record.  *Id.* at 1356–57.

---

[9] No party disputes that Ahtna is "an actual offeror that submitted a timely proposal for this procurement [and] was included in the competitive range."  Compl. ¶ 8.

Generally, in an action brought pursuant to § 1491(b) of the Tucker Act, the Court reviews "the agency's actions according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706." *See Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019). That APA standard, in turn, requires the Court to determine "whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (citing 5 U.S.C. § 706(2)). In other words, the Court must "determine whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Id.* (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009)). "When a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (internal citation marks omitted). "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

"In applying the APA standard of review, this Court affords considerable deference to an agency's procurement decisions." *IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 286 (2022) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)). In particular, protests involving "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). Thus, in reviewing an agency's procurement decision, the Court shall merely "determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Impresa*, 238 F.3d at 1332–33 (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). Accordingly, the Court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citing *Colo. Interstate Gas Co. v. Fed. Power Comm'n*, 324 U.S. 581, 595 (1945)). "On the other hand, the Court will not put words in an agency's mouth or invent supporting rationales the agency has not itself articulated in the administrative record; *post hoc* explanations for agency decisions ordinarily will be rejected." *IAP Worldwide Servs.*, 159 Fed. Cl. at 286.

To establish prejudice on the merits in a post-award challenge, a plaintiff must show with record evidence that, but for the agency's error, "the protestor's chance of securing the award [would] not have been insubstantial." *Info. Tech. & Applications Corp.*, 316 F.3d at 1319; *see also Oak Grove Techs., LLC v. United States*, 155 Fed. Cl. 84, 98 (2021) (discussing standard of review and showing of prejudice in bid protest cases).

## IV.   DISCUSSION

The Court rejects all of Ahtna's challenges to the procurement at issue.  In addition, the Court finds that Ahtna has failed to demonstrate prejudice on the merits: even if Ahtna had succeeded in demonstrating that ICE improperly awarded the contract to AIP, the administrative record clearly shows that Paragon, and not Ahtna, is next in line for award.

### A.  Count I: ICE's Pricing Evaluation

Ahtna argues that ICE failed to verify that offerors' price proposals are consistent with their technical proposals, in violation of the RFP.  Pl. MJAR at 10–12.  In addition, according to Ahtna, AIP's pricing was:  (1) incomplete and unreasonable, *id.* at 12–13; (2) contained arithmetic inaccuracies that ICE never identified, *id.* at 13–15; and (3) did not reflect the applicable CBAs, *id.* at 15–17.  Ahtna has fails to meet its burden to demonstrate that the government erred.

### 1.  Ahtna Does Not Meet Its Burden to Demonstrate that ICE Unreasonably Evaluated AIP's Price Proposal

Ahtna offers scant evidence to substantiate that AIP's pricing is inconsistent with its technical approach.  The Court concludes that Ahtna's cited evidence does not support its argument.

Ahtna identified only two putative examples where AIP's proposal contains conflicting information — both involving the number of full-time equivalents ("FTEs"). Pl. MJAR at 11 (first citing AR 4314, 4321, 4478–85 for one comparison; and then citing AR 4430, 4478, 4480 for a second comparison).  Separately, Ahtna's complaint sketches out alleged "[e]rrors and inconsistencies in AIP's BOEs," but the administrative record does not support these allegations.  *Id.* at 11 (citing Compl. ¶¶ 108–10).  In particular, Ahtna asserts that the total costs of two specific employee roles should be much higher than what AIP represents in its proposal.  *Id.* (citing Compl. ¶¶ 108–110).[10]  Ahtna contends that ICE's failure to correct for AIP's alleged errors means "AIP's actual Total Evaluated Price would have been . . . higher" than Ahtna's total evaluated price of approximately $246 million.  *Id.* at 11–12.  Ahtna further asserts, but without support, that AIP understated each labor category "often by 70 to 85%," such that AIP's total evaluated price was about $55 million lower than what it would be for AIP to execute its proposed staffing plan.  *Id.* at 14 & n.1.

---

[10] *See also* Tr. 17:19–25, 18:1–4 ("[T]he essence of the allegation is because the BOEs and the technical [approach] don't match, . . . [e]ither the computed price is way low . . . or the technical volume overpromised people[.]").

Ahtna provides no evidence for these assertions and does not address Paragon's pricing at all.[11]  Because an MJAR is a "trial on the record," *Bannum*, 404 F.3d at 1354, Ahtna can only meet its burden of proof with facts substantiated by the administrative record, *see* RCFC 52.1(c)(1) ("[A] party may move for . . . judgment on the administrative record and must include in its motion or supporting memorandum a statement of facts that *draws upon and cites to the portions of the administrative record* that bear on the issues presented to the court." (emphasis added)).   At a minimum, Ahtna's MJAR would necessitate that the Court fill in logical and evidentiary gaps.  The Court will not construct Ahtna's arguments for it.  *See, e.g.*, *United States v. Dunkel*, 927 F.2d 955, 956 (Fed. Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim. . . . Judges are not like pigs, hunting for truffles buried in briefs." (citation omitted)); *Advanced Powder Sols., Inc. v. United States*, 160 Fed. Cl. 575, 582 (2022) ("The mere citation of a case, statute, or regulation does not an argument make. . . . [T]he Court will not litigate this matter on behalf of [Plaintiff]." (citation omitted)).  Ahtna *does* provide some snippets of facts that fairly raise some questions about ICE's evaluation, but mere questions or suggestions of error do not themselves constitute proof.

Ahtna does not demonstrate to the Court that reconciling AIP's FTE figures necessarily means AIP's price should have been higher, let alone to the scale Ahtna suggests.  Even if Ahtna were to convince the Court that AIP understated its pricing for the two positions Ahtna challenges, that would equate only to an error of approximately [ * * * ].  *See* Pl. MJAR at 14.  Ahtna thus fails to demonstrate that AIP's pricing should have been millions of dollars higher.  Simply put, although Ahtna repeatedly asserts that AIP's price proposal erred to the tune of $55 million, *see id.* at 14 n.1,[12] Ahtna's MJAR is devoid of any methodology or calculation substantiating that value, *see* Tr. 20:1–23 (Ahtna agreeing that $55 million is "the conclusion from a calculation that [the Court does not] have" and asserting that Ahtna "just provided the conclusion of . . . a rather lengthy but not complicated calculation").[13]  Indeed, Ahtna insists its $55 million sum is somehow

---

[11] Whereas Ahtna in Count I of the complaint challenged ICE's evaluation of both AIP's and Paragon's pricing, Compl. ¶¶ 101–03, 106, 108–15, 118–21 (AIP); *id.* ¶¶ 104, 114, 116, 118–19 (Paragon), Ahtna's MJAR argument in support of Count I does not challenge Paragon's pricing beyond conclusory sentences that are patently insufficient, *see, e.g.*, Pl. MJAR at 10–11  ("ICE did not compare AIP's (or apparently any other offerors') [p]rice proposals against their [t]echnical approaches[.]" (emphasis omitted)).  Indeed, the *only* argument in Ahtna's MJAR that specifically targets ICE's review of Paragon's proposal concerns whether ICE failed to assign Paragon a particular weakness.  *See* Pl. MJAR at 30 n.4; Tr. 156:16–25, 157:1–23.  The Court addresses this issue *infra* Section IV.H.

[12] *See also* Tr. 20:1–2, 72:19–25.

[13] "'[A] lawyer's statements may constitute a binding admission of a party[ ]' if the statements are 'deliberate, clear, and unambiguous[.]'" *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 347 (4th Cir. 2014) (alterations in original) (quoting *Fraternal Ord. of Police Lodge No. 89 v. Prince George's Cnty.*, 608 F.3d 183, 190 (4th Cir. 2010)); *see also, e.g.*, *Checo v. Shinseki*, 748 F.3d 1373, 1378 n.5 (Fed.

revealed "just from the evidence in the record itself."  Tr. 22:3–4.  Ahtna then asks this Court to carry out Ahtna's proposed calculations as if the analysis is merely mechanical and limited to a few items — it is not.  *See* Tr. 14:9–25, 15:1–15 (Ahtna admitting that its estimates are not contained in "the actual spreadsheet" but rather the Court would have to "carry out the same analysis and follow the same [alleged] mistakes" from Ahtna's two illustrative examples).[14]

The Court rejects Ahtna's reliance on its complaint to support its MJAR for two reasons:  (1) the administrative record does not include a plaintiff's complaint; and (2) a complaint, by definition, consists of allegations, not evidence.  *See Naval Sys. v. United States*, 153 Fed. Cl. 166, 178–79 (2021) ("Th[e] [administrative] record will normally include the information relied upon by the relevant agency decision makers and their advisers in reaching the decisions being challenged, and the contemporaneously articulated reasons for these decisions." (emphasis omitted) (quoting *East West, Inc. v. United States*, 100 Fed. Cl. 53, 56 (2011))); *Slattery v. United States*, 53 Fed. Cl. 258, 281 (2002) ("Courts have determined that pleadings and complaints are not evidence." (citing *United States v. Zermeno*, 66 F.3d 1058, 1062 (9th Cir. 1995))), *aff'd*, 583 F.3d 800 (Fed. Cir. 2009), *reh'g en banc granted, opinion vacated on other grounds*, 369 F. App'x 142 (Fed. Cir. 2010), *on reh'g en banc*, 635 F.3d 1298 (Fed. Cir. 2011).[15]  The Court rejects Ahtna's suggestion that

---

Cir. 2014) (questioning the Veterans Court's "reluctance to accept [a] concession" made at oral argument and citing case law for the proposition that admissions are generally binding on the parties); *VS2, LLC v. United States*, 155 Fed. Cl. 738, 764 n.23 (2021).

[14] Again, the Court notes that Ahtna provided only two examples of alleged errors in AIP's pricing.  The Court asked at oral argument how it could determine "that any other listing is wrong without doing the math [itself]?"  Tr. 41:20–21.  Ahtna responded: "Just from looking at them.  So, from that perspective, we do not go item by item for the several dozens or hundreds of [entries]."  Tr. 41:22–25; *see also* Tr. 41:25, 42:1–2 (Ahtna agreeing that the Court "would have to replicate this math").  *See also infra* Section IV.A.3.

[15] *See also* Rules Committee Notes on RCFC 52.1, 2006 version (describing the administrative record as "provid[ing] a factual and procedural predicate for a portion of the court's decision"); *CWT/Alexander Travel Ltd. v. United States*, 78 Fed. Cl. 486, 493 n.7 (2007) (finding "unsubstantiated factual assertions in pleadings do not constitute evidence" after plaintiffs "included [data] in their complaint and pleadings . . . [and] have not . . . supported the data with an affidavit"); *Square One Armoring Servs. Co. v. United States*, 2022 WL 4391358, at *9 (Fed. Cl. Sept. 22, 2022) ("[T]he [Plaintiff's] Complaint is not evidence that can support a motion for summary judgment[.]"); *JSW Steel (USA) Inc. v. United States*, 466 F. Supp. 3d 1320, 1328 (Ct. Int'l Trade 2020) ("The administrative record includes only those documents directly or indirectly considered by the agency."); *Newton v. Off. of the Architect of the Capitol*, 840 F. Supp. 2d 384, 397 (D.D.C. 2012) ("The facts alleged in a complaint are not evidence for the purposes of a motion for summary judgment. Moreover, the D.C. Circuit has explained that 'a district court should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis[.]" (first alteration in original) (citation omitted) (quoting *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996))); *Xereas v. Heiss*, 2022 WL 4355309,

we accept Ahtna's calculations on faith.  In sum, Ahtna's allegations that AIP understated the price of certain labor categories by 70–85% and its total price by $55 million are nothing more than unsupported, conclusory statements.[16]

In any event, AIP adequately explained the alleged discrepancies in its proposal and demonstrated why the FTE numbers varied across different proposal volumes. Although Ahtna notes how AIP proposed [ * * * ] FTEs in its staffing plan but included only [ * * * ] FTEs in its price proposal, Pl. MJAR at 11, AIP explained that its staffing plan for [ * * * ] FTEs simply accounted for the possibility of having to meet "contract requirements . . . at [a] facility capacity of 1,175 detainees," AR 4383; *see also* Def.-Int. MJAR at 12 (citing AR 4383).  As Ahtna itself noted, *see* Pl. MJAR at 12, AIP planned to hire [ * * * ] FTEs to accommodate up to 650 detainees, *see* Def.-Int. MJAR at 12–13 (citing AR 4430).[17]  The average of [ * * * ] FTEs and [ * * * ] FTEs — corresponding to the low and high estimates of detainees, respectively — is [ * * * ] FTEs.    Thus, AIP reasonably explained that "pricing at [ * * * ] FTEs reflects a valid business understanding and splitting of potential risk between staffing at [ * * * ] FTEs and staffing at [ * * * ] FTEs." Def.-Int. MJAR at 12.[18]  Moreover, both AIP and, more importantly, the government are permitted to accept the risk of AIP's pricing strategy.  In that regard, the government reasonably evaluated and accepted AIP's approach to its pricing calculation.  *See*

---

at *5 (D.D.C. Sept. 20, 2022) ("Perhaps the evidence for these claims [in the complaint] could be unearthed somewhere in the record; however, a 'district court should not be obliged to sift through hundreds of pages of [the record] . . . in order to make [its] own analysis.'" (quoting *Newton*, 840 F. Supp. 2d at 397) (second alteration in original)), *appeal filed*, No. 22-7140 (D.C. Cir. filed Oct. 19, 2022); *Rahimi v. Weinstein*, 2020 WL 1873588, at *4 (D.D.C. Apr. 15, 2020) ("[F]acts alleged in a complaint[] are not evidence for the purposes of a motion for summary judgment." (quoting *Newton*, 840 F. Supp. at 397)).

[16] *See* Tr. 41:3–9 ("THE COURT:  But then the only way I can get to the 70 to 85 percent for each labor category would be for myself to do the same analysis that you did in the complaint? [AHTNA COUNSEL]:  So if you wanted to see the specific overall price, that would be the way to get there[.]").

[17] The Court is uncertain why AIP's average appears to be off by 0.7 FTEs.  Moreover, although AIP mistakenly cites AR 4330, AIP clearly meant to cite AR 4430 for the proposition that AIP accepted the risk of increasing its staffing level to support higher detainee counts.  Def.-Int. MJAR at 12–13.

[18] Ahtna asserts that AIP priced for [ * * * ] FTEs, Pl. MJAR at 12, while AIP and the government each indicate [ * * * ] FTEs, *see* Def. MJAR at 6; Def.-Int. MJAR at 12.  The two FTE discrepancy is likely attributable to transition personnel.  *See* Def. MJAR at 6 (noting that AIP proposed "[ * * * ] FTEs for each year of performance, *not counting transition personnel*" (emphasis added)).  Whether the appropriate FTE count includes or excludes the transition personnel is immaterial and not at issue in this case in any event.

AR 4931, 4945–46, 4987; *cf. Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381–82 (Fed. Cir. 2009) (describing the standard of review).[19]

Ahtna further develops its inconsistency claim by arguing that the RFP required offerors to employ a specific FTE definition in their pricing and AIP improperly disregarded that definition.  Pl. Resp. at 3–4.  According to Ahtna, the government defined an FTE as 2,080 hours, a figure AIP's position-specific calculations apparently did not use.  *Id.* at 3.  To support that argument, Ahtna relies entirely on *its* discussions with ICE, which informed Ahtna that "[a] full-time equivalent is 2080 [hours]."  *Id.* at 3 (emphasis omitted) (first quoting AR 3139; and then citing AR 3157, 4922).  The point of ICE's communication with Ahtna about the number of hours in an FTE was not to set a mandatory pricing assumption, but rather to inform Ahtna that its initial proposal's assumption that an FTE was 2,088 hours caused Ahtna to budget more "health and welfare" hours per year than the CBAs required.  AR 3139, 3157, 4922; *see also* AR 1283, 1326, 1397 (CBAs limiting health and welfare benefits at 2,080 hours per year).

Also, AIP's explanation for why it did not employ the 2,080-hours-per-FTE assumption makes a great deal of sense.  In a nutshell, AIP employed a completely different approach to its calculations from Ahtna.  AIP differentiated between productive and non-productive employee time and thus captured FTE costs elsewhere.  Tr. 73–74.  For example, even Ahtna recognized that the RFP "mandate[d] a large amount of 'non-productive' hours for which an employee must be compensated (part of the 2,080 hours)."  Pl. Resp. at 4 (citing AR 3322).  These non-productive hours included sick leave, paid time off, holidays, breaks, gearing up and down and related walking time, and training.  *Id.*  Unlike Ahtna, however, AIP never defined "a full work year for an FTE," Tr. 114:23–25, 115:1–14, because the Solicitation did not require "fringe benefits . . . to be specified by line item."  Def.-Int. Resp. at 12 (citing AR 432 (RFP Attach. 2)).  AIP therefore captured only productive hours in its position-specific, line-by-line price proposal.  *See* Tr. 115:17–116:24 (AIP relying upon AR 4480 to show that a position's total cost of [ * * * ], staff count of [ * * * ] FTEs, and hourly compensation of [ * * * ] plus [ * * * ] of health and welfare necessarily imply that each such FTE will work [ * * * ] productive hours).

Accordingly, Ahtna does not demonstrate that AIP understated anything.  Instead, AIP had a separate fringe benefit line under "Other Direct Costs / Indirect Costs Profit Proposed" that included "[p]ayroll taxes, [health and welfare], retirement, workers comp,

---

[19] Ahtna also claims that AIP's pricing spreadsheet only shows [ * * * ] FTEs for a detainee population of up to 650.  Pl. MJAR at 7, 11, 19.  To support that assertion, Ahtna relies upon AR 4478, 4480, and 4481.  *Id.*  These cited record pages, however, include no express references to [ * * * ] FTEs.  Moreover, Ahtna provides no explanation of the mechanics of its FTE calculation, and no rationale for why its calculation differs from AIP's or the government's.  Ahtna's *complaint* contains a calculation, *see* Compl. ¶ 71 n.3, but it is far from self-explanatory, and, in any event, the complaint is not evidence.  *See supra* note 15 and accompanying text.

PTO, [and] vac[a]tion[.]"  Def.-Int. Resp. at 12; *see also* AR 4478–85; Tr. 54:24–25, 55:20–25, 56:1–5 (AIP explaining that "fringe" captured "any other expense that would be applied to the . . . fully burdened rate"); Tr. 120:12–21 (AIP explaining that ICE evaluators could extract AIP's assumptions regarding productive hours).  AIP thus appears to correctly reframe ICE's FTE discussions with Ahtna: ICE's notation to Ahtna that "[a] full-time equivalent is 2080" hours, AR 3139, meant a full-time equivalent *under Ahtna's approach* is 2080 hours.  AIP did not follow the same staffing approach as Ahtna, so naturally AIP's pricing assumptions and calculations were different.

In sum, AIP's fringe benefit calculations used a percentage to capture the non-productive hours, *see* Tr. 121:6–10, and AIP and the government accepted risks associated with AIP's methodology, *see* Tr 43:14–25, 44:1–2.  ICE's decision to accept AIP's approach to calculating productive FTEs was reasonable.

## 2.  Ahtna Fails to Demonstrate that AIP's Pricing Was Incomplete or Unbalanced

The RFP required ICE to "review and evaluate 'all CLINs' . . . in offerors' Pricing Summaries for 'completeness, balance, and reasonableness.'"  Pl. MJAR at 10–12 (quoting AR 2397–99 (RFP § M.7)).  Ahtna asserts that ICE did not do so, but Ahtna's arguments are either cursory, abandoned, or nonexistent.

With respect to completeness, Ahtna relies entirely on the alleged "errors" it discusses earlier in its MJAR and does not identify even a single element of AIP's proposal that is incomplete.  Pl. MJAR at 12.  To the extent this argument is simply coterminous with Ahtna's contentions addressed above, this Court already has rejected them, *supra* Section IV.A.1, and need not repeat itself.

With respect to AIP's alleged unbalanced pricing, Ahtna at oral argument abandoned that claim.  *See* Tr. 25:21–25, 26:1–13.  Thus, the Court does not address the issue further.[20]

## 3.  Ahtna Fails to Demonstrate that AIP's Proposal Contains Errors or was Otherwise Noncompliant

Ahtna argues that ICE failed to evaluate the "arithmetic accuracy" and "consistency" of AIP's price proposal, contrary to the solicitation's requirements.  Pl. MJAR at 13 (quoting AR 2397–99 (RFP § M.7)).  In particular, Ahtna asserts that:

---

[20] Ahtna's unbalanced pricing arguments include its critique of how ICE compared proposals' CLIN pricing and interpreted the results.  Pl. MJAR at 12–13.  The Court further notes that Ahtna made no independent argument about reasonableness and the Court does not address that issue further either.

(1) "AIP's [p]rice proposal contains mathematical errors in calculating its 'Total Cost' for virtually all of its employee positions," including in "each and every labor category," *id.* at 14 (emphasis omitted); and (2) "AIP's proposal should also have been rejected outright for failing to follow the Solicitation instructions" because AIP allegedly did not show certain calculations in its spreadsheets, *id.* at 14–15 (citing AR 2386 (RFP § L.6.5)).

Ahtna does not come close to meeting its burden of proof.  For starters, Ahtna attempts to show that AIP's calculations are flawed by pointing to mere allegations in Ahtna's own complaint or by citing sums that are the result of Ahtna's unexplained calculations not contained in the record.  Pl. MJAR at 14.  The Court reiterates, however, that the complaint and unexplained calculations are not evidence in the administrative record.  *See* discussion *supra* Section IV.A.1.[21]  Ahtna does not, for example, show its calculation of what it views as AIP's actual pricing or explain why AIP's calculations are wrong.  This Court cannot accept Ahtna's mere *ipse dixit*; rather, Ahtna must carry the burden to *prove* its claim with *record evidence*.  At best, Ahtna's argument is a mere sketch of a potential problem, but that is plainly insufficient to carry the day.

At oral argument, Ahtna agreed that it provided only two examples of putative errors, but asserted that the Court should be able to identify additional errors "[j]ust from looking at them."  Tr. 41:22–24 (Ahtna admitting that its MJAR filings "[did] not go item by item for the several dozens or hundreds" of labor categories).  But the Court cannot

_____

[21] Typically, parties submit expert declarations to support such calculations or attempt to supplement the administrative record with such declarations.  *See, e.g.*, *McConnell, Jones, Lanier & Murphy LLP v. United States*, 128 Fed. Cl. 218, 237 (2016) ("In light of these principles, [the plaintiff] will be permitted to supplement the record with [an expert's] declaration for limited purposes: to give the Court the benefit of his quantitative analysis of the impact of the errors the agency allegedly committed."); *DynCorp Int'l, LLC v. United States*, 125 Fed. Cl. 1, 3 (2016) ("The [expert] report does not introduce extra-record facts, but instead includes calculations and explanations based on data in the contemporaneous record to aid the Court in better understanding the record. By including [the expert's] report, [the plaintiff] aims to clarify the Court's understanding of an important issue in the agency's decision[.]"); *Lab'y Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 386, 389 (2014) (concluding that the Court may consider an expert's "quantitative analysis" of proposals as well as "calculations based on data already contained in the administrative record"); *FirstLine Transp. Sec., Inc. v. United States*, 116 Fed. Cl. 324, 326–27 (2014) (permitting expert declaration to provide "calculations based on data already contained in the administrative record, so that the Court can better understand the record"); *VSolvit, LLC v. United States*, 151 Fed. Cl. 678, 685–86 (2020) (explaining that supplementation is appropriate to explain information of a "highly technical and complex nature, requiring explication via affidavits or expert testimony" (quoting *East West*, 100 Fed. Cl. at 57)); *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 241–42 (2016) ("Expert testimony may be offered to assist the court in understanding complex or technical information" so the Court can "effectively review aspects of the challenged agency procurement[.]" (citing *NCL Logistics Co. v. United States*, 109 Fed. Cl. 596, 613 (2013))), *aff'd*, 904 F.3d 980.  Ahtna did not pursue such a course here.

discern any errors simply by perusing some spreadsheets. *See id.* Indeed, Ahtna agreed that the Court "would have to replicate this math [itself]." Tr. 41:25, 42:1–2. That concession alone is fatal to Ahtna's argument.

Ahtna further contends that "AIP's 'Total Cost' for each labor category was understated often by 70 to 85% — a percentage far greater than the difference between AIP['s] and Ahtna Logistics' Total Evaluated Prices." Pl. MJAR at 14. Ahtna does not cite *any* support for that assertion; literally, Ahtna points to nothing in the administrative record and did not bother submitting an expert's calculation to support the alleged error percentages. *See Naval Sys.*, 153 Fed. Cl. at 181–82. Just as the government must show its work in the administrative record,[22] a plaintiff must do the same. *See, e.g.*, *Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018) ("In deciding these [MJARs], the court considers 'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" (quoting *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006))).[23] Ahtna cannot prevail on this argument in the absence of marshaling specific supporting evidence from the administrative record or an expert report opining on the calculations.

In any event, the Court agrees with the government that the agency reasonably considered, and extensively documented its analysis of, AIP's pricing proposal. *See* Def. MJAR at 24–25 (discussing AR 4928–42 (final price analysis for each offeror's proposal)).

With regard to whether AIP's pricing spreadsheets complied with the Solicitation, the RFP declares in bold type only that "[o]fferors that provide limited information *may*

---

[22] *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 663 (4th Cir. 2017) ("[T]he dispute here arises from a problem that has become all too common among administrative decisions challenged in court – a problem decision makers could avoid by following the admonition they have no doubt heard since their grade-school math class: Show your work."); *Tolliver Grp.*, 151 Fed. Cl. at 110 ("Meaningful judicial review requires more than just accepting . . . a bald assertion.").

[23] *See also Rotech Healthcare Inc. v. United States*, 118 Fed. Cl. 408, 413 (2014) ("The question before a court faced with a [MJAR] is whether, based upon both the disputed and undisputed facts in the administrative record . . . , the plaintiff has met its burden of proof[.]" (citing *Bannum*, 404 F.3d at 1356)); *Plateau Software v. United States*, 2022 WL 16758543, at *7 (Fed. Cl. Oct. 18, 2022) ("The plaintiff must prove, by a preponderance of the evidence, that '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029 (Fed Cir. 2009))); *Mil-Mar Century Corp. v. United States*, 111 Fed. Cl. 508, 528 n.5 (2013) ("[P]laintiff has failed to meet the heavy burden of proof necessary to show that this determination lacked a rational basis[.]" (citing cases)); *Omniplex World Servs. Corp. v. United States*, 105 Fed. Cl. 706, 715 (2012) ("When challenging an agency's technical determination, a plaintiff bears 'an unusually heavy burden of proof in showing that the determination made in this regard was arbitrary and capricious.'" (quoting *Cont'l Bus. Enters., Inc. v. United States*, 196 Ct. Cl. 627, 637 (1971))).

be determined to lack understanding of the requirement." AR 2386 (RFP § L.6.5) (emphasis added). What that language demonstrates is that there is *no* mandatory compliance requirement for the pricing spreadsheets such that ICE must exclude an offeror merely because some particular cell in a spreadsheet is not completed in an ideal manner. Tr. 61:18–25, 62:1–16. To the contrary, the permissive word "may" yielded ICE maximal discretion;[24] the RFP did not *require* the agency to flag risks related to the lack of calculations, let alone remove a proposal from consideration because of limited information. Thus, even if an isolated phrase in the RFP might be read as suggesting that ICE would verify the arithmetic accuracy of every number in every cell of every spreadsheet an offeror submitted — a highly improbable reading — the RFP as a whole makes clear that the purpose of the BOEs is "to ensure the offeror's understand[ing] [of] the requirement" such that a lack of accuracy only risked exclusion. AR 2398; *see also* Tr. 63:3–6 (Ahtna agreeing that if an offeror's proposal "does not allow the Government to conduct the evaluation that they're required to undertake, the offeror is being told they are at risk"). In other words, the RFP cannot be reasonably read to *require* AIP's exclusion from the procurement even if AIP had made some calculation errors or failed to present data in a particular manner.[25]

Accordingly, the Court rejects Ahtna's claim that the absence of some formulas in AIP's spreadsheets required ICE to eliminate AIP's proposal from consideration.

### 4. ICE Reasonably Determined that AIP Properly Accounted for Collective Bargaining Agreements

Ahtna's final argument about AIP's pricing is that it failed "to . . . compl[y] with the applicable CBAs." Pl. MJAR at 15–17 (quoting AR 2398–99 (RFP § M.7)). As noted above, however, the RFP provided little to no detail regarding how offerors had to address the CBAs. *See* AR 2387 (RFP § L.6.5) ("To ensure a fair procurement process, the

---

[24] FAR 2.101 ("*May* denotes the permissive").

[25] To the extent the RFP provides that "[e]ach *price* will be validated by examining the arithmetic accuracy and consistency of the information presented in the proposal," AR 2398 (RFP § M.7) (emphasis added), that language does not clearly cover the BOEs specifically but rather may refer only to the CLIN pricing. At best, the RFP is ambiguous about precisely *what* ICE must validate for "arithmetic accuracy." *Id.* The other provision upon which Ahtna relies — the RFP's instruction that "offerors must show the calculations used to arrive at the proposed unit price," Pl. MJAR at 14–15 (quoting AR 2386 (§ L.6.5)) — is similarly ambiguous. Ahtna asks this Court to read "unit price" as referring to each individual labor category, *see* Tr. 61:6–9, but the government asserts "unit price" refers to CLIN pricing, *see* Tr. 45:11–12, 46:7–10. The RFP is simply not clear and Ahtna does not argue otherwise. *See* Tr. 60:21–25 ("THE COURT: Well, what is the unit price? Is that term defined in context anywhere? [AHTNA COUNSEL]: I don't believe that it was . . . I don't believe the unit price is spelled out."). Of course, Ahtna cannot challenge the government's preferred reading of an ambiguous RFP provision at this stage of the procurement. *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007).

Government instructs all offerors to base pricing for all [CBA] labor categories on the entry level position with no seniority or leave accrual."). The CBAs clearly are more of a contract performance issue than anything else. *Id.* ("The CBAs outlined in Section J will be incorporated into the contract[.]").

Nevertheless, Ahtna argues AIP's calculations omit certain required fringe benefits. Pl. MJAR at 16–17; Pl. Resp. at 9. In particular, Ahtna describes how AIP failed to account for at least one CBA that will require the contract awardee to pay "fringe benefits" that include an "hourly uniform maintenance/cleaning allowance" and a "personal hygiene stipend." Pl. MJAR at 15 (citing AR 1519).

As explained *supra* Section IV.A.1, however, AIP separated productive work hours from non-productive ones (*e.g.*, vacation and training) and estimated the latter in a cross-position fringe calculation. While the blank spreadsheet attached to the RFP asked for offerors to specify their "total" costs of direct labor on several tabs, AR 422–28 (RFP Attach. 2), that spreadsheet only asked for fully burdened rates by position on the summary tab, Def. Resp. at 12–13 (citing AR 432 (RFP Attach. 2)); Def.-Int. Resp. at 12 (citing same). As AIP persuasively demonstrated at oral argument, AIP's pricing hewed closely to the spreadsheet template's structure and thus included fringe benefits in the "Fringe" line that appears under "Other Direct Costs/Indirect Costs Profit Proposed." Tr. 54:24–25, 55:11–25, 56:1–5 (AIP describing its final pricing proposal at AR 4481); Def. Resp. at 13 (citing AR 3843–69); *see also* Def.-Int. Resp. at 12 (citing AR 3843–69).

Accordingly, the fully burdened rates that AIP included in its summary tab reflect that it and Ahtna used different approaches to fringe benefits as AIP's burdened rates clearly exceed the sum of just the hourly rate plus health and welfare costs. Tr. 57:9–14 (AIP describing its final pricing summary tab, AR 4491); *see* AR 4491 (AIP's final pricing summary tab showing in the first row, for example, an hourly rate of [ * * * ], health and welfare of [ * * * ], and a fully burdened rate of [ * * * ]).

Although the RFP provided that "[a]ll submitted prices will be checked to ensure compliance with the applicable Wage Determination or CBAs," AR 2398–99 (RFP § M.7), ICE, and not this Court, is in the best position to determine whether AIP's approach is sufficient. Particularly in the absence of expert analysis from Ahtna, and in the absence of any clear violation of the RFP, the Court holds that ICE reasonably concluded that all offerors complied with the CBAs. *See* AR 4945, 4946.1–46.9 (ICE's Post Discussion/Final Price Analysis Report). Ahtna has not met its burden to show that AIP failed to address the CBAs in AIP's price proposal or that ICE unreasonably considered the issue.

### B. Count II: ICE's Evaluation of Staffing Plans and Procedures

Contrary to Ahtna's assertions, Pl. MJAR at 17–19, AIP's approach to staffing in its technical volume did not violate the RFP.[26]

The Court must be clear about what Ahtna is *not* arguing. Ahtna does not assert that AIP's staffing plan (in the technical volume) violated any sort of mandatory minimum RFP requirement, nor could Ahtna do so. Indeed, as AIP correctly observes, Def.-Int. MJAR at 20; Def.-Int. Resp. at 18–19, the RFP expressly permitted deviations from the minimum post requirements[27] upon which Ahtna bases its argument:

> The contractor Staffing Plan shall address the minimum post requirements of Attachment 3: PIDC Minimum Post Breakdown. ***Any deviation(s)*** from the template . . . must demonstrate conformance with all PWS and contract requirements and applicable standards[.]

AR 2382 (emphasis added) (RFP § L.6.3). Thus, deviations from the "minimum post requirements" were clearly permitted. At oral argument, Ahtna conceded this point. Tr. 84:21–25; Tr. 85:1–17 ("[I]t was permitted to have a situation where you might provide a deviation from these very specific post requirements, [but] you had to explain how you still were going to cover the post."); Tr. 98:22–99:8 (Ahtna concurring that offerors may "deviate from the post requirements," but "[t]hey just have to explain it").[28]

Accordingly, Ahtna contends only that AIP's "proposed reductions and deviations from the minimum post requirements . . . should have 'decrease[d] the Government's confidence' that AIP 'understand[s] the minimum staffing requirements of the facility.'" Pl. MJAR at 17 (second and third alterations in original) (quoting AR 3179–80 (revised competitive range notification)). But the Court agrees that ICE reasonably determined that AIP actually "exceeded the requirement." Def. MJAR at 18–

---

[26] The Court notes that Count II is at least partially derivative of Count I. *See* Tr. 90:6–20 (Ahtna conceding that its allegation in Count II that "ICE failed to compare any offeror's price proposals against technical proposals" is the "[s]ame allegation" as in Count I but just in a "[d]ifferent count"); Tr. 95:4–17 ("THE COURT: . . . I'm not deciding a different factual issue in Count Two than I am in Count One, right? [AHTNA COUNSEL]: You are correct. They are the same, citing to the same factual predicates[.]").

[27] "Post" refers to a guard station. *See* Tr. 85:24–25, 86:1–3.

[28] *See also* Tr. 88:7–9 ("THE COURT: Okay. So there is no such thing as a deviation which is per se impermissible. [AHTNA COUNSEL]: Correct. Correct, thank you.").

19 (citing AR 4321, 4733).  Indeed, the administrative record supports the government's position, given ICE's explanation:

> AIP has staffing procedures, staffing elements, and a staffing plan that demonstrated their understanding of how staffing relates to the solicitation requirements and successful contract performance. . . . AIP has proposed policies and procedures, administrative chains of command [and] an organizational chart that illustrate a sound organizational structure and ensure[] adequate staffing coverage to meet the requirements of the solicitation and ensure successful contract performance. . . .  [AIP] utilize[s] their dynamic staffing approach to increase and decrease their workforce fast based on the needs of the facility.  Based on the evaluation above, the Government has high confidence that the offeror understands the requirement, proposes a sound technical approach, and will be successful in performing the requirement.

AR 4733 (AIP Final Technical Consensus Evaluation).

In sum, the Court agrees with the government that, "[a]t best," Ahtna merely "disagrees with the results set forth in ICE's evaluation of AIP's staffing proposal."  Def. Resp. at 14.  That is patently "not sufficient to demonstrate that ICE committed any errors in the evaluation of AIP's proposal."  *Id.* (citing *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 740 (2008)).[29]

## C. Count III: ICE's Evaluation of Technical Capability / Management Approaches

Ahtna asserts that "AIP's [p]rice proposal revealed numerous errors, including inconsistencies in the FTEs proposed; reductions and deviations to ICE's 'minimum post requirements'; arithmetical errors in AIP's pricing; and non-compliance with the applicable CBAs."  Pl. MJAR at 19.  This is merely a regurgitation of Ahtna's arguments (albeit under a different tagline) that the Court already rejected above.

---

[29] To the extent Ahtna argues that AIP somehow violated the RFP in deviating from so-called "minimum post requirements," that issue is untimely and waived pursuant to *Blue & Gold*.  *See* Tr. 86:1–20 (Ahtna concurring that "there is some tension between saying something is a minimum requirement and then saying, 'but you may deviate from the minimum as long as it's explained'" and agreeing that "that ship has sailed, because if there was some patent ambiguity, [Ahtna] needed to raise that"); *see also Blue & Gold Fleet, L.P.*, 492 F.3d 1308.

To the extent Ahtna referenced any new (alleged) facts unique to Count III, Ahtna's critique of the government's evaluation of AIP's proposal is, yet again, nothing more than rank *ipse dixit*.  For example, while Ahtna asserts that "ICE's acceptance of AIP's technology-heavy/people-light approach . . . was unreasonable," Pl. MJAR at 20, Ahtna merely disagrees with ICE's assessment; Ahtna does not show that ICE's assessment is arbitrary, capricious, or contrary to law.

### D.  Count IV: ICE's Evaluation of AIP's Transition Plan

Ahtna argues that ICE should not have assigned AIP a High Confidence rating for its transition plan.  Pl. MJAR 20.  To support this contention, Ahtna contrasts its incumbent staff with AIP's proposal to "recruit, interview, hire, and train new employees."  *Id.* at 20–21.  Of course, even assuming that Ahtna's proposal is superior due to the availability of incumbent staff, it does not follow that ICE had to downgrade AIP's proposal.  Indeed, what the RFP required was the submission of *a plan*; the RFP did not provide that an incumbent would *ipso facto* be rated higher, something that likely would be unlawful in any event.  *See* AR 2383 (RFP § L.6.3) ("The Transition Plan shall illustrate how the contractor will ramp up for full performance under the contract[.]"); AR 2393 (RFP § M.5.1) (providing that ICE would evaluate how well "the offeror's *plan* will provide a seamless transition *plan*" (emphasis added)).

Ahtna further asserts that "by proposing lower hourly rates and insufficient fringe benefits[,] . . . AIP will not be able to recruit and retain" the necessary staff.  Pl. MJAR at 21.  Ahtna does not support either part of that assertion with record evidence or expert opinion and the Court again rejects Ahtna's *ipse dixit*.

Finally, in seeking to support Count IV, Ahtna argues that ICE informed AIP of a staffing "deficiency" during discussions, but failed to recognize that AIP's FPR left the deficiency unresolved.  Pl. MJAR at 21.  Ahtna misreads AIP's discussion responses and its FPR.  *Compare* AR 3395 (ICE flagging the deficiency), *with* AR 3636 (AIP explaining, in response to ICE, that AIP would update its proposal "to clarify that key personnel will be presented to ICE within 5 days of contract award"), *and* AR 3699 (AIP's revised proposal indicating that AIP would submit a key personnel slate "within five (5) days of contract award").  Moreover, AIP's FPR assumed a contract start date of April 1, AR 4328, and specified that the task of presenting key personnel for approval  would begin on April 5 — four days after the start.  AR 4328.  While AIP's proposal apparently allocated additional time "for the conclusion of any ongoing discussions with [ICE] regarding key personnel resumes," Def.-Int. Resp. at 22, that does not undermine ICE's evaluation of AIP's transition plan.  The Court notes that the key personnel resumes were in fact transmitted to the contracting officer five days after the contract award.  *See* AR 6521–22.

### E.  Count V: ICE's Evaluation of Past Performance

Ahtna offers two arguments in support of its contention that ICE did not appropriately assess AIP's past performance: (1) ICE should not have found AIP's past performance references relevant; and (2) ICE should have downgraded AIP because its past performance references were from an affiliated corporate entity.  Pl. MJAR at 22–24.  The Court rejects the first argument because Ahtna misconstrues the role of ICE's assessment of "relevance" as part of the past performance evaluation.  Ahtna's second argument fails because it ignores or mischaracterizes the resources AIP planned to leverage to perform the PIDC contract.

As described *supra* Section I.A, ICE assigned a confidence rating to offerors' past performance based on an assessment of the "recency, relevancy, scope, and complexity" of the submitted past performance references.  AR 2394 (RFP § M.5.1).  Offerors that lacked recent, relevant, or "any" record of performance would receive a "Neutral Confidence" rating; otherwise, ICE would evaluate past performance as High Confidence, Some Confidence, or Low Confidence.  AR 2394 (RFP § M.5.1); *see* AR 2397 (RFP § M.7).  Offerors were not limited to submitting past performance references of their own, but rather could "submit past performance information regarding predecessor companies . . . [and] affiliate companies," provided offerors explained (1) the predecessor's corporate relationship with the offeror, and (2) how affiliates would be involved in, and share resources with, the offeror to perform the PIDC contract.  AR 2384 (RFP § L.6.4).

Ahtna provided ICE with three past performance contracts: two were Ahtna's and a third was from a related entity, Ahtna Support and Training Services.  AR 4949–54; AR 4984 (SSDD).  AIP provided three past performance contracts for an affiliate, Akima Global Services ("AGS").  AR 4955–59; AR 4985 (SSDD).  ICE evaluated both Ahtna and AIP with a High Confidence rating in past performance.  AR 4948.

Ahtna's critique of AIP's past performance evaluation, Pl. MJAR at 22–23, is misplaced: pursuant to the RFP, an offeror's role in the past performance reference contracts is not determinative of either relevance or ICE's overall past performance evaluation.  Indeed, the RFP makes clear that relevance is derived from how similar a past performance reference is in terms of its size, scope, and complexity to the PIDC contract.  *See* AR 2384 (RFP § L.6.4) (requiring the submission of "recent and relevant contracts" that are of "the same or similar size, scope, and complexity" to the current procurement at issue); AR 2394 (RFP § M.5.1) (effectively defining "relevant" as "similar in size, scope and complexity to this effort").  Thus, AIP's past performance references are not less relevant merely because they are for an affiliate company.

Moreover, AIP's proposal demonstrates that it would use AGS resources to perform the awarded contract.  According to the very part of AIP's initial proposal that

28

Ahtna cites, Pl. MJAR at 23 (citing AR 2683), AIP explains that "AGS management personnel, Subject Matter Experts (SMEs), resources, technology tools, company policies and business processes, and the company Quality Management System (QMS) are being directly transferred from AGS to AIP to provide specific expertise to ensure predictable and repeatable successful contract execution," AR 2683. A simple organizational chart shows AIP and AGS are sister companies with a common parent, Akima, LLC. AR 2683; *see also* Tr. 179:24–181:2 (describing AR 2683). AIP's proposal continues by identifying thirteen specific people with AGS experience who would be part of AIP's corporate leadership, the shared services that span AIP and AGS, and AIP's proposed transition for the PIDC contract. AR 2684–85. The proposal also lists "[s]hared [s]ystems, [p]lans, and [p]olicies." AR 2688; *see also* AR 4312 (organizational chart in AIP's final proposal that includes shared services and corporate support).

Even if this Court were to agree with Ahtna that AIP proposed using Ahtna managers (and no AGS managers), Pl. MJAR at 23, Ahtna's argument would require this Court to find that, overall, AIP proposed insufficient AGS resources for ICE to give AIP past performance credit for its references. Ahtna does not come close to substantiating such an attack. Ahtna's silence — by focusing only on AIP's proposed managers — is understandable given that ICE's Final Past Performance Evaluation reasonably concluded that AIP would leverage a cornucopia of AGS resources. AR 4955 (Final Past Performance Evaluation).

Finally, the Court notes that the RFP allowed ICE to give a High Confidence rating to an offeror with strong performance on recent contracts that were only moderately relevant. *See* AR 2394 (RFP § M.5.1). To do so, ICE needed only to conclude that the past performance references gave it a "high expectation that the offeror will successfully perform." AR 2394 (RFP § M.5.1). Accordingly, even if ICE relied upon past performance references from AIP that were not "most relevant," that did not preclude ICE from evaluating AIP with a High Confidence rating in past performance.

### F. Count VI: The Discussions Process

Ahtna makes two arguments regarding how ICE conducted discussions: (1) ICE engaged in misleading discussions; and (2) ICE engaged in unequal discussions. A single fatal defect in the first applies with equal force to defeat the second: Ahtna never contests the accuracy of ICE's discussion feedback to Ahtna.

Ahtna first argues that ICE engaged in misleading discussions that "forced [Ahtna] to increase its staffing, which in turn caused Ahtna . . . to increase its initial price" by approximately $26.3 million. Pl. MJAR at 25–26. Ahtna asserts that it was prejudiced because it would have had a higher chance at award with its initial, lower price. As oral argument made clear, however, *see* Tr. 129:13–130:14, Ahtna's argument is fatally flawed because nowhere does Ahtna explain how or why ICE's initial critique of Ahtna's

proposal was incorrect or otherwise misleading.  Even the cases upon which Ahtna itself relies require that a (successful) misleading discussions argument demonstrate that an agency's communications were "incorrect, confusing, or ambiguous."  Pl. MJAR at 24 (quoting *Quality Control Int'l, LLC v. United States*, 147 Fed. Cl. 193, 198–99 (2020)).  Ahtna does not even attempt to do so and, thus, this argument does not even make it to the launch pad.[30]

Ahtna's second discussions-related argument — that ICE engaged in unequal discussions, Pl. MJAR at 26–28 — is similarly defective.  Discussions are unequal when a procuring agency favors "one offeror over another," FAR 15.306(e)(1).  Although contracting officers should tailor discussions to each offeror's proposal, FAR 15.306(d)(1), they cannot "inform some offerors of a concern . . . while staying silent with respect to identical issues in other offerors' proposals."  Pl. MJAR at 26 (alteration in original) (quoting *Raytheon Co. v. United States*, 121 Fed. Cl. 135, 164–65 (2015)).  Ahtna does *not* contend, however, that the agency's discussions improperly and unfairly aided AIP to improve its proposal and refrained from similarly aiding Ahtna.[31]  Rather, Ahtna asserts that "[b]y informing Ahtna Logistics of [ICE's] concerns with regard to adequate staffing, *but not AIP*, ICE engaged in prejudicially unequal discussions."  *Id.* at 27 (emphasis added).  According to Ahtna, "[h]ad ICE engaged in equal discussions, AIP would have been forced to increase their staffing and their pricing" too.  *Id.*[32]

The obvious problem, however, is that *Ahtna nowhere demonstrates that ICE erred in evaluating Ahtna's or AIP's proposals*.  Ahtna does not argue, let alone prove, that ICE's staffing concerns about Ahtna's proposal were false *per se* or otherwise misleading.  According to Ahtna's logic, ICE should have delivered similar adequate staffing concerns to AIP, such that AIP would have raised *its* price.  *See* Pl. MJAR at 26 ("ICE . . . did not take issue with AIP's proposed staffing reductions and deviations.").  Ahtna is trying to

---

[30] At oral argument, Ahtna all but conceded that its misleading discussion argument did not explain how ICE was wrong or how Ahtna was misled; instead, Ahtna asserted that its argument was "maybe . . . more of [an] unequal discussions" argument.  Tr. 129:12–25.

[31] *See, e.g., Nat'l Med. Staffing, Inc.*, B-259402, 95-1 CPD ¶ 163, 1995 WL 132382, at *2 (Comp. Gen. Mar. 24, 1995) ("Two of the three offerors were told during discussions that their proposals lacked information regarding correctional or related experience/ability to work with inmates.  The third, [the protestor], was never advised during discussions of its proposal's lack of information regarding such experience, even though the protester's proposal received 0 points from each evaluator under this evaluation criterion, due solely to the lack of such information.  By pointing out to the other two offerors the exact weakness found in the protester's proposal, while failing to advise the protester of that weakness, the agency conducted discussions which were neither meaningful nor equal.").

[32] Ahtna raises the same argument with respect to its approach to counting detainees under the technical capability factor.  Pl. MJAR at 27–28.  That detainee count argument suffers from the same critical defects as the staffing argument.

smuggle an unsubstantiated conclusion into the premise of its argument: that ICE should have *actually* assessed AIP's initial proposal as lacking adequate staffing and should have communicated that assessment during discussions to AIP. Without that (unsubstantiated) assumption, Ahtna's failure to challenge its own assessment leads the Court to the ineluctable conclusion that ICE conducted accurate assessments: it assessed inadequate staffing where it should have (*i.e.*, regarding Ahtna's proposal) and assessed adequate staffing where it should have (*i.e.*, regarding AIP's proposal). But Ahtna's premise — that ICE should have communicated weaknesses to AIP but did not do so — simply was not ICE's conclusion, and Ahtna does not demonstrate otherwise.

Put differently, all Ahtna really attempts to do here is relitigate its contentions from its other counts (*i.e.*, that ICE should have downgraded AIP's initial proposal). Once again, Ahtna points to differences between the *results* of its evaluation and AIP's, but Ahtna never demonstrates here (or anywhere else) that ICE's evaluation was unfair or otherwise flawed, given the full context of the offerors' differing technical approaches and pricing methodologies. Because Ahtna focuses here only whether ICE correctly evaluated AIP's initial proposal, Ahtna's unequal discussion argument is nothing more than a rehash of its repeated assertion that ICE improperly evaluated AIP's proposal.

The Court further rejects as factually unsupported Ahtna's allegation that ICE somehow "forced" Ahtna "to increase its initial price" by approximately $26.3 million. Pl. MJAR at 25–26. The administrative record demonstrates rather conclusively that ICE merely criticized the level of detail in Ahtna's technical and staffing approach:

> In the areas where [Ahtna] doesn't align with the minimum staffing as provided in the RFP, ***there is a lack of explanation*** on how perceived efficiencies are going to be conducted in the execution of contract requirements. . . . The ***lack of detail*** decreases the Government's confidence Ahtna understands the minimum staffing requirements or demonstrates conformance with all PWS and contract requirements which greatly effects contract performance.

AR 3179 (emphasis added) (ICE's revised discussion letter to Ahtna, addressing Factor 2 weaknesses). That is just one example amongst others. *See e.g.*, AR 3180 ("This lack of detail . . . does not demonstrate conformance with the PWS and contract requirements which results in low confidence."). ICE never *required* or otherwise "forced" Ahtna to increase its proposed staffing. While ICE also critiqued Ahtna for proposing "a deviation from the minimum staffing [for] . . . Posts [ * * * ]" — indicating that "[t]he Government doesn't agree with the removal of these positions," AR 3180 — Ahtna was unable to show how that feedback, *regarding just these three posts*, somehow translated to a price increase of $26.3 million. *See* Tr. 142:3–25 (Ahtna agreeing that ICE "didn't say all of your staffing

is terrible and so grossly understaffed and you need a drastic increase in all of your staffing if you are even going to have a hope of winning").

In sum, Ahtna argues nothing new under the unequal discussions argument header that this Court has not already dispatched; Ahtna's discussion-related arguments are as unsubstantiated as the others.

### G. Count VII: Unequal Treatment & Count VIII: ICE's Best Value Decision

Counts VII and VIII are entirely derivate of, and depend on, the substance of arguments this Court already has rejected. Thus, Ahtna does not succeed on the merits of either count.

### H. Ahtna Does Not Demonstrate Prejudice

As explained above with regard to standing, *see supra* Sections I.E and II, Ahtna in its complaint recognizes that it must challenge Paragon's evaluation to demonstrate prejudice, *see* Compl. ¶¶ 12–14, 20–23, 123, 135, 146, 156, 210, 214–16. The fatal problem for Ahtna here is that it must not only *allege* facts demonstrating prejudice (for standing purposes), but also *must prove* those facts and its associated claims against Paragon to demonstrate prejudice *on the merits*. For whatever reason, however — and despite effectively promising in the complaint to show that ICE made all sorts of errors with regard to Paragon — Ahtna abandons all of its attacks on Paragon, save one *made only in a footnote*. *See* Pl. MJAR at 30 n.4. There, Ahtna asserts: (1) ICE identified a weakness in Paragon's initial proposal and instructed Paragon to address it; (2) Paragon failed to address that weakness in its FPR; and (3) ICE did not downgrade Paragon for that failure. *Id.* In particular, Ahtna argues that Paragon proposed a detainee tracking system (called [ * * * ]) that ICE evaluators assessed with a weakness. *Id.* According to Ahtna, Paragon left that weakness "unresolved," and "[t]he SSA failed to consider" that problem, "rendering [the SSA's] findings regarding Paragon arbitrary and capricious." *Id.*

Just to be clear, there is no avoiding the fact that Ahtna's counsel at oral argument conceded that Ahtna's prejudice argument hinges on the lone aforementioned footnote:

> **THE COURT:** . . . Forget the interested party stuff. On the merits[, you maintain] you're prejudiced because you would have a substantial chance of winning if I sent it back for a new best value determination. The Government says, "[No], P[a]ragon wins." If you knock out AIP, P[a]ragon wins, not you, and you're not entitled to a new best value decision in that case. [Thus,] [y]ou have to prevail on that footnote.

[AHTNA COUNSEL]: We would have to prevail on that footnote[.]

Tr. 167:7–16.

Although Ahtna argued that it made "some other points . . . in the briefing about other problems with P[a]ragon," Ahtna conceded those were all in its response brief, not its opening MJAR. *See* Tr. 167:20–22, 168:3–9. Arguments made for the first time in a response brief — particularly those necessary to establish prejudice, consistent with the plaintiff's burden — are waived. *See, e.g.*, *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief — they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration"); *Ironclad/EEI v. United States*, 78 Fed. Cl. 351, 358 (2007) (noting that "under the law of [the Federal Circuit], arguments not presented in a party's principal brief to the court are typically deemed to have been waived" and explaining that "courts are constrained to find, '[a]s a matter of litigation fairness and procedure,' that arguments not addressed in moving briefs have been waived" (alteration in original) (quoting *Novosteel SA*, 284 F.3d at 1274)); *Advanced Powder Sols., Inc.*, 160 Fed. Cl. at 581 n.8 ("[A] reply brief is an entirely inappropriate medium for new arguments.").

Turning to the substance of Ahtna's challenge to Paragon's evaluation, the Court finds that the premise of Ahtna's argument is demonstrably and so obviously wrong that the argument borders on frivolous. Ahtna's premise is that Paragon proposed to use the [ * * * ] system that ICE evaluators, according to Ahtna, "considered . . . a weakness, raising questions about [Paragon's] compliance with PWS requirements." Pl. MJAR at 30 n.4 (citing AR 3171). But there is no evidence supporting that assertion. If anything, the cited page in the administrative record, AR 3171, suggests the opposite. That specific page reference is part of a January 27, 2022, letter from ICE to Paragon containing ICE's "Competitive Range Notification, Discussion Questions, and Request for Proposal Revisions." AR 3169 (the "Discussions Letter"). The Discussions Letter, in general, directed Paragon to address distinct categories of evaluator assessments, including "[1] deficiencies, [2] significant weaknesses, [3] weaknesses, [4] *findings, and* [5] *negotiation points* for each price and non-price evaluation factor." *Id.* (emphasis added).

For Factor 1 — Technical Capability/Management Approach — the Discussions Letter contained only two categories of discussion items for Paragon to address: (1) "Weaknesses," AR 3169–70 (listing five items); and (2) "Findings," AR 3170–71 (listing eight items). Critically, for the purposes of Ahtna's argument, the only item discussing Paragon's tracking system is under the "Findings" header, *not the "Weaknesses" header*. AR 3171 (Finding No. 8). Furthermore, ICE did not even suggest the existence of a weakness within the applicable finding, quoted here in its entirety:

> The PWS does not require a detainee tracking system.
> Paragon is offering a Detainee Tracking System. It is unclear
> whether the data will follow all guidelines of Section IV,
> F. Maintenance of A Video Surveillance Program in the PWS.
> Please clarify the level of security, ICE's level of accessibility
> to the footage and whether Paragon will follow Section IV for
> detainee tracking system information as well.

AR 3171.[33]

During oral argument, Ahtna doubled down, once again referencing a "finding of the initial weakness," this time citing AR 3424. Tr. 172:18; *see also* Pl. MJAR at 30 n.4 (referencing AR 3424). That administrative record citation is to a page of a revised final discussions letter to Paragon, dated March 2, 2022, commenting on previously submitted proposal revisions. AR 3423–26 ("requesting [FPRs] to be submitted as a result of this discussion letter"). In that letter, ICE addresses [ * * * ] again under the "Findings" category, AR 3424, not "Weaknesses," AR 3423. To make matters worse, far from identifying [ * * * ] as a potential weakness, ICE made the following "strength" finding:

> In the original proposal, Paragon proposed to utilize a system
> called "[ * * * ][.]" In the first proposal revision, [ * * * ] were
> removed from the proposal. ***Please note, the Government***
> ***considered the innovation a strength***. If [ * * * ] is
> resubmitted, the original security question must be
> addressed.

AR 3424 (emphasis added). Ahtna makes no mention of ICE's strength finding for [ * * * ], reflecting a lack of candor. In any event, because ICE identified no weakness[34] regarding

---

[33] The other "Findings" listed in the Discussions Letter reinforce the Court's determination that these points are not substantive criticisms of Paragon's proposal. In the eight findings, including the one about the tracking system, ICE asked Paragon for clarifications in seven, and in the eighth, ICE asked Paragon to remove a proposed hotline that already existed. AR 3170–71.

[34] Counsel for Ahtna, at oral argument, repeated several times this erroneous assertion regarding Paragon's alleged weakness. Tr. 171:11–13 ("And once the [ * * * ] came back in, the weakness should have come back[.]"); Tr. 171:24–25 (Ahtna asserting that, regarding [ * * * ], Paragon's final proposal "does not address the specific findings and *weaknesses*" — plural (emphasis added)). The Court is unsure how Ahtna made this repeated factual error, but litigants are on notice that such clear factual misstatements risk sanctions pursuant to RCFC 11. *See Mann v. Gomez*, 2022 WL 2077952, at *3–5 (E.D. Va. June 9, 2022) ("[A] litigant who reaffirms at oral argument a position previously set forth in a written statement is 'later advocating' that earlier paper within the meaning of Rule 11, and so can be sanctioned in a way not permitted under Rule 11 when the advocacy concerns an issue that has arisen for the first time during oral argument."), *appeal*

[ * * * ] for Paragon to address, the entire premise of Ahtna's prejudice argument evaporates.

But the problems for Ahtna do not end there.  Ahtna cites AR 4739 to support the contention that "the final evaluation document (incorrectly) noted [Paragon's] weakness had been removed because the offeror removed the detainee tracking system from its proposal."  Pl. MJAR at 30 n.4 (citing AR 4739).  To characterize that assertion as an embellishment is an understatement.  AR 4739 is part of the Final Technical Evaluation Team ("TET") Consensus Report for Paragon, AR 4736–4745, which explains that "[ * * * ]" is "a detainee tracking system (DTS)," AR 4739.  Notably — and this is another fact that Ahtna conspicuously fails to mention — the TET's cited discussion of Paragon's proposed DTS is under the "Strengths" heading, AR 4737–39; ICE concluded that Paragon's proposed DTS "is an *innovative and creative solution* of leveraging technology to ensur[e] full security and accountability throughout the facility" and that Paragon's related "methodology of accountability throughout the facility increases the Government's confidence they will successfully perform contract requirements," *id.* (emphasis added).  Because ICE *never* assigned Paragon a weakness for the proposed DTS, there would have been no reason for the TET to reference a weakness.  Indeed, Ahtna is just plain wrong in asserting that the TET noted that "the weakness had been removed"; AR 4739 indicates no such thing.[35]

This is a game-over issue.  Absent a successful attack on Paragon's evaluation, Paragon is next in line for contract award — *i.e.*, even if Ahtna were to succeed in upending ICE's evaluation of AIP.  We know the SSA gave both Ahtna's and Paragon's FPRs High Confidence technical ratings across all four non-price factors, and we know

---

dismissed sub nom. Mann v. Burgess, No. 22-1676 (4th Cir. July 25, 2022); *HD Brous & Co. v. Mrzyglocki*, 2004 WL 376555, at \*15 (S.D.N.Y. Feb. 26, 2004) ("While not all oral statements to a Court are sanctionable under Rule 11, counsel's conduct at oral argument clearly enjoys a close enough nexus to the underlying papers to bring it within the scope of Rule 11." (citing *O'Brien v. Alexander*, 101 F.3d 1479 (2d. Cir. 1996))).

[35] Although the Court need not say more on this issue, the Court notes that ICE reasonably concluded, if only implicitly, that Paragon addressed the applicable discussions finding.  *See, e.g.,* AR 4498 ("Access to the system is closely controlled in accordance with [Performance-Based National Detention Standards] 2011 Section 7.1 and DHS requirements for Safeguarding Sensitive Information.  This system was implemented by Paragon's sister company Global Precision Systems . . . and is currently providing critical . . . data to ICE officials and managers."); AR 4586–87 (Paragon FPR) (addressing security question and explaining that "[a]ll IT innovations meet or exceed [Performance-Based National Detention Standards] 2011 and DHS requirements for Safeguarding of Sensitive Information Privacy Policy Directives."); AR 4982 (SSDD) ("Paragon is also offering . . . innovative and creative solutions such as a Detainee Tracking System ([ * * * ]) which will increase full security and accountability throughout the facility and AssetCloudOP for detainee supply and property tracking system.").

Paragon's total evaluated price was more than $23 million less than Ahtna's.  Moreover, Paragon is next in line because the SSA specifically compared Paragon and Ahtna:

> **Factor 1 — Technical Capability/Management Approach Tradeoff Determination:** AIP *and Paragon* are offering a form of detainee tracking system.  The detainee tracking system is considered a benefit of superior ability and increases the probability of successful contract performance as it will enable better tracking of movement which decreases security risk and enhances operations at the facility.  *The benefit from this superior ability merits a higher price.* . . . While Ahtna is offering innovations, the innovations are not considered benefits of superior abilities.
>
> For Factor 1, I have determined AIP *and Paragon* are offering benefits of superior abilities by comparing the differences in the ratings.

AR 4982 (emphasis added).

The fact that Paragon is superior to Ahtna for award purposes is also evident in the SSA's ultimate source selection tradeoff analysis:

> As documented above, it has been the determination of the SSA, that AIP *and Paragon offered superior ability and benefits of successful contract performance that would merit a higher price* in Factor 1.  They both offered the detainee management tracking system. . . . Overall, based on the assessment of all the evaluation factors and comparison of the difference in non-price evaluation factor ratings, *AIP is offering the superior solution/approach and merits a higher price.  However, AIP is also offering the lowest price.*  The Government does not need to engage in paying a higher price for superior ability and probability of successful contract performance.  I have determined that the proposals by Ahtna and [Paragon] did not warrant a price premium.

AR 4992–93 (emphasis added).[36]

---

[36] The SSDD contains a clear scrivener's error in referring to "Ahtna and AIP . . . not warrant[ing] a price premium."  AR 4993 (listing multiple ways AIP's proposal "merits a higher price").  The SSA clearly intended to write "Ahtna and Paragon" in that sentence, not "Ahtna and AIP." AR 4993.

Accordingly, Ahtna was simply wrong in asserting at oral argument that "there was never any comparative assessment between Ahtna and P[a]ragon anywhere in the actual procurement" but rather "only in the context of the GAO litigation."  Tr. 176:1–4. To the contrary, Paragon — which ICE found merited a higher price, but cost less, than Ahtna — was clearly next in line for award (after AIP).  Thus, Ahtna cannot demonstrate prejudice on the merits merely by attacking AIP's evaluation, which is all Ahtna has done in this case (aside from the lone [ * * * ] issue).  Although Ahtna, before this Court, remedied the "interested party" defect that resulted in GAO's dismissing Ahtna's protest in that forum, *see* AR 6661 (*Ahtna Logistics*, 2022 WL 2664108, at *5), Ahtna ultimately did not support its allegations against Paragon here, and thus fails to demonstrate prejudice on the merits, *see, e.g.*, *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021) (concluding that this Court's "factual findings" underlying the prejudice determination are reviewed only "for clear error," that "there is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision," and that "[t]he protestor must show prejudice under the usual standard").[37]

## V.   CONCLUSION

For the above reasons, the Court **DENIES** Plaintiff's motion for judgment on the administrative record and **GRANTS** Defendant's and Defendant-Intervenor's respective motions for judgment on the administrative record.  Accordingly, the Clerk of the Court is directed to enter **JUDGMENT** for Defendant and Defendant-Intervenor, terminating this case.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge

---

[37] *See also HVF W., LLC v. United States*, 846 F. App'x 896, 898 (Fed. Cir. 2021) ("In order for [plaintiff] to show that it had a substantial chance of winning the award for this solicitation, it had to sufficiently challenge the eligibility of [awardee] and both of the intervening bidders."); *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1380 (Fed. Cir. 2020) ("To show prejudicial error, [Plaintiff] must show a 'substantial chance' that the SSA . . . would have made a different award decision but for the alleged error[.]"(quoting *Info. Tech. & Applications Corp.*, 316 F.3d at 1319)); *L-3 Commc'ns EOTech, Inc. v. United States*, 85 Fed. Cl. 667, 671 (2009) (finding that if "the trial court [in a bid protest] determines [that] the government acted without rational basis or contrary to law . . . it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct" where "[p]laintiff again bears the burden of proof" (quoting *Bannum, Inc.*, 404 F.3d at 1351 (second alteration in original))); *Insight Pub. Sector, Inc. v. United States*, 161 Fed. Cl. 760, 802 (2022) ("To establish prejudice, a plaintiff *must prove* that there is a 'substantial chance' it would receive the award in the absence of the allegedly unequal treatment[.]" (emphasis added) (quoting *WellPoint Mil. Care Corp.*, 953 F.3d at 1380)).